592 P.2d 1302

**The STATE of Arizona, Appellee,**

v.

**Rosa Elizabeth HEATH, Appellant.**

**No. 2 CA–CR 1541.**

Court of Appeals of Arizona, Division 2.

Feb. 15, 1979.

Rehearing Denied March 14, 1979.

2. *Compare Greer*, supra, with *State v. O'Dell*, 108 Ariz. 53, 492 P.2d 1160 (1972).

37

Robert K. Corbin, Atty. Gen., by William J. Schafer, III, and Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Robert J. Snyder, Jr., Sierra Vista, for appellant.

## OPINION

HOWARD, Judge.

Appellant was convicted by a jury of second-degree murder and sentenced by the trial court to a term of 50 to 60 years in the Arizona State Prison. She contends the trial court erred in (1) admitting into evidence statements she made to the police prior to receiving her *"Miranda"* warnings, (2) refusing to instruct the jury on voluntary manslaughter, (3) failing to give her instructions on the issue of sanity and (4) sentencing her to an excessive term in prison. We affirm.

The victim, James Clemens, was the manager of the apartments in which appellant lived. He had never had any trouble with appellant. On the day of the murder, appellant telephoned Mr. Clemens asking him to come to her apartment to collect the rent and he departed with the rent receipt book. When Mrs. Clemens became aware that her husband had not returned she sent her

daughter to find him. He could not be found and appellant did not answer the daughter's knock on the door. Mrs. Clemens then procured a passkey and went to appellant's apartment. After knocking and receiving no response, Mrs. Clemens unlocked the door, which she had difficulty opening because it appeared something was blocking it. When she finally was able to open the door wide enough, she could see appellant lying in the middle of the floor and discovered her husband was also on the floor, his body blocking the door. Mrs. Clemens ran to a neighboring apartment and reported that her husband was hurt. She then ran back to appellant's apartment while the neighbors called the police.

Officers Harper and Walker of the Sierra Vista Police Department responded to a radio call informing them that two persons had "passed out" in an apartment due to an "unknown type of medical problem". The officers arrived at the apartment house at the same time and entered appellant's apartment. Officer Harper, the first to enter, looked down and saw Mr. Clemens on the floor. On surveying the rest of the apartment, he noticed appellant lying on the floor on her back. She was conscious and had her eyes open. He went over to appellant and asked her for identification. Appellant pointed to her purse on a nearby chair. Harper removed appellant's drivers license from the purse and ascertained her identity. Although he had seen blood under Mr. Clemens' head, he still did not know what had happened. Without giving appellant any "*Miranda*" warning, he asked her what had happened and she told him that she had shot Mr. Clemens and then shot herself. Harper was concerned for his safety because appellant's hands were underneath her and he was unable to see them. He then asked appellant where the gun was. She told him it was under the couch. He went to the couch and secured the weapon. He asked appellant where she had been wounded and she told him she had been wounded on the left side. She then stated that she had previously shot another person and had never been convicted. At that point Officer Harper read appellant her "*Miranda*" rights.

As for the officers' failure to read appellant her "*Miranda*" rights prior to asking her what had happened, Arizona follows the rule that an on-the-scene investigation not amounting to custodial interrogation does not require giving the "*Miranda*" warning. *State v. Melot*, 108 Ariz. 527, 502 P.2d 1346 (1972). An analogous fact situation was present in the case of *Pope v. State*, 478 P.2d 801 (Alaska 1970). There, the first law enforcement officer on the scene of the murder found the deceased with a woman at his head and the defendant kneeling or squatting alongside him. After determining that the victim was dead, the officer asked the woman what had happened. She told him the defendant had shot the deceased. The officer then frisked the defendant and asked him if he had a gun, to which defendant replied that he did and that it was in the car. In response to defendant's contention that the officer should have given him the "*Miranda*" warning before asking him the location of the weapon, the Alaska court stated:

"But the case at bar is a strong one for applying the 'on-the-scene questioning' exception to the *Miranda* warning requirement. The officer here was presented with a situation of great emergency. A crime of violence had occurred, the victim was lying on the ground dead. There was more than one person present. Both to protect his own safety and that of others, the officer had to elicit information about what had happened, and about the gun which had obviously been used in the killing. For the same reason the officer also had the right to conduct a strictly limited search ('frisk') of Pope's person for weapons under the rule of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which he did. To hold that, that while a policeman faced with an emergency such as the one which confronted Officer Pavlovich may 'frisk' a suspect for weapons he may not simultaneously ask him whether he is armed, would be an unrealistic and unreasonable extension of the *Miranda* rule." 478 P.2d at 805.

As with the officer in *Pope*, Officer Harper was presented with an emergency situation. His questions were on-the-scene questioning designed to determine what had occurred and to protect those present. Although appellant was lying on the floor and her freedom of movement may have been restricted by her wounds, there was no evidence that her freedom of movement was significantly curtailed by any action of the police. There was no in-custodial interrogation and therefore no necessity to give a *"Miranda"* warning. Her statement about killing another person was spontaneous, not the result of any interrogation, and did not require any *"Miranda"* warning. *State v. Landrum*, 112 Ariz. 555, 544 P.2d 664 (1976).

We do not agree with appellant's contention that the trial court erred in rejecting her instructions on voluntary manslaughter. Under the statute in existence at the time of the killing, A.R.S. Sec. 13–456, voluntary manslaughter was defined as being upon a sudden quarrel or heat of passion. There was absolutely no evidence of any quarrel or heat of passion. Appellant did not testify. There was no explanation of why she killed Mr. Clemens. An instruction not supported by the evidence should not be given. *State v. Smith*, 113 Ariz. 298, 552 P.2d 1192 (1976).

Appellant requested three different insanity instructions, dealing with emotional insanity, irresistible impulse and partial impairment. The trial court refused to give these instructions but did give the *M'Naghten* instruction. The court did not err in so doing. The sole test for legal insanity in Arizona is the *M'Naghten* test. *State v. Steelman*, 120 Ariz. 1213, 585 P.2d 1213 (1978).

Last, appellant contends that, because the court felt that in her present mental state appellant was a dangerous person, it in effect went beyond punishing appellant for her acts and punished her for her mental disease, contrary to the Eighth Amendment to the United States Constitution. This contention is without merit. In imposing the long sentence, the court was not punishing her for her mental condition but, instead, was punishing her for taking a life for no reason whatsoever, and because it felt it had a duty to the public to see that she did not do it again. These are legitimate reasons justifying the imposition of a long prison term.

Affirmed.

HATHAWAY, J., and RICHMOND, C. J., concurring.